

1  Robert S. Green (State Bar No. 136183)
   Robert A. Jigarjian (State Bar No. 171107)
2  **GREEN & JIGARJIAN LLP**
   235 Pine Street, 15th Floor
3  San Francisco, CA 94104
   Telephone: (415) 477-6700
4  Facsimile: (415) 477-6710

5  [Additional Counsel on Signature Page]

6  Attorneys for Plaintiff

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10  EDWARD ERIKSON, individually and On       ) Case No.
11  Behalf Of All Others Similarly Situated,   )
                                               ) **CLASS ACTION COMPLAINT FOR**
12                  Plaintiff,                  ) **VIOLATION OF FEDERAL**
                                               ) **SECURITIES LAWS**
13                                             )
    vs.                                        )
14                                             )
    CORNERSTONE PROPANE PARTNERS LP,           )
15  KEITH G. BAXTER, RICHARD D. NYE,           )
    RONALD J. GOEDDE, and CURTIS G.            )
16  SOLSVIG, III,                              )
                                               )
17                                             )
                  Defendants.                  )
18                                             ) **JURY TRIAL DEMANDED**
                                               )
19  _____

20      Plaintiff, Edward Erikson, ("Plaintiff") individually and on behalf of all other persons

21  similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the

22  following based upon personal knowledge as to himself and his own acts, and information and

23  belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

24  his attorneys, which included among other things, a review of the defendants' public documents,

25  conference calls and announcements made by defendants, United States Securities and Exchange

26  Commission ("SEC") filings, wire and press releases published by and regarding CornerStone

27  Propane Partners LP ("CornerStone" or the "Partnership"), securities analysts' reports and

28  advisories about the Partnership, and information readily available on the Internet. Plaintiff

complaint.wpd

1   believes that substantial evidentiary support will exist for the allegations set forth herein after a

2   reasonable opportunity for discovery.

3   <u>**NATURE OF THE ACTION**</u>

4       1.    This is a federal Class Action brought by the Plaintiff on behalf of himself and a

5   Class consisting of all other persons who purchased the publicly traded securities of CornerStone

6   Propane Partners LP (NYSE: CNO, OTC: CNPP.PK), between November 2, 1999 and February

7   11, 2003, inclusive (the "Class Period"), seeking to recover damages caused by Defendants'

8   violations of federal securities laws and pursue remedies under the Securities Exchange Act of

9   1934 (the "Exchange Act").

10      2.    CornerStone is a master limited partnership.  The Partnership is the nation's fifth

11  largest retail propane marketer serving over 480,000 customers with annualized sales of

12  approximately 335 million retail gallons, doing business in 34 states through approximately 270

13  customer service centers.  Through its North American energy solutions service team at Coast

14  Energy Group (a subsidiary), the Partnership also supplies, purchases, processes and markets

15  over 48,000 barrels per day of natural gas liquids to resellers and major end users, sells

16  approximately 1.0 Bcf per day of natural gas and 100,000 barrels per day of crude oil in the

17  United States and Canada.

18      3.    This Class Action concerns CornerStone's dissemination of false and misleading

19  statements to the investing public with respect to its financial results during the Class Period.

20  More specifically, during the Class Period, the Partnership was faced with the crisis of having to

21  renegotiate its capital credit lending agreements which were set to expire on November 30, 2001.

22  Faced with this situation of needing to obtain capital credit or face liquidation, the Partnership,

23  during the Class Period, issued statements that failed to disclose and/or misrepresented the

24  following adverse facts, among others:  (1) that the Partnership had materially overstated its

25  earnings before interest, taxes, depreciation and amortization ("EBITDA"), net income and

26  earnings per unit; (2) that the Partnership lacked adequate internal controls and was therefore

27  unable to ascertain the true financial condition of the Partnership; and (3) that as a result, the

28  value of the Partnership's EBITDA,  net income and financial results were materially overstated

1   at all relevant times.

2   ## JURISDICTION AND VENUE

3       4.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

4   the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17

5   C.F.R. §240.10b-5).

6       5.      This Court has jurisdiction over the subject matter of this action pursuant to §27

7   of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

8       6.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15

9   U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein,

10  including the preparation and dissemination of materially false and misleading information,

11  occurred in substantial part in this District.  Additionally, the Partnership maintains its principal

12  executive offices in this Judicial District.

13      7.      In connection with the acts, conduct and other wrongs alleged in this complaint,

14  defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

15  including but not limited to, the United States mails, interstate telephone communications and

16  the facilities of the national securities exchange.

17  ## THE PARTIES

18      8.      Plaintiff Edward Erikson purchased CornerStone securities, as set forth in the

19  accompanying certification attached hereto and incorporated herein by reference, and has

20  suffered damages as a result of the wrongful acts of defendants as alleged herein.

21      9.      Defendant CornerStone Corporation is a Delaware corporation with its principal

22  place of business at 432 Westridge Drive, Watsonville, CA 95076.

23      10.     Defendant Keith G. Baxter ("Baxter") is and was, at all relevant times of the Class

24  Period, the Partnership's Chief Executive Officer and Managing General Partner until

25  July 25, 2002.

26      11.     Defendant Richard D. Nye ("Nye") is and was, all relevant times of the Class

27  Period, the Partnership's Vice President of Finance and Administration and Chief Financial

28  Officer.

complaint.wpd

12.     Defendant Ronald J. Goedde ("Goedde") was the Partnership's Chief Financial Officer and Executive Vice President during the Class Period and held these position until June 30, 2001.

13.     Defendant Curtis G. Solsvig III ("Solsvig") was the Partnership's Chief Executive Officer during the Class Period and assumed this role on or about July 25, 2002.

14.     Defendants Baxter, Nye, Goedde, and Solsvig are collectively referred to hereafter as the "Individual Defendants." During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of CornerStone, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

15.     Each of the Individual Defendants are liable as a direct participant with respect to a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CornerStone securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding CornerStone's business, operations, management, and the intrinsic value of CornerStone securities and caused Plaintiff and other members of the Class to purchase CornerStone securities at artificially inflated prices.

16.     In addition, the Individual Defendants, by reason of their status as senior executive officers and directors, were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Partnership to engage in the unlawful conduct complained of herein. Because of their position of control, the Individual Defendants were able to and did, directly or indirectly, control the content of various SEC filings, press releases, and other public statements pertaining to the Partnership during the Class Period.

complaint.wpd

17.     The Individual Defendants, because of their positions with the Partnership, were provided with copies of the Partnership's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representation contained therein.

18.     Individual Defendants are liable, jointly and severally, as direct participants in and co-conspirators of, the wrongs complained of herein.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a federal class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased the securities of CornerStone between November 2, 1999 and February 11, 2003, inclusive, (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Partnership, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CornerStone securities were actively traded on the on the New York Stock Exchange ("NYSE") and the Over-the-Counter Bulletin Board ("OTC").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

21.     Plaintiff's claims are typical of the claims of the members of the Class, because plaintiff and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

23.     A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

24.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     Whether the Partnership's publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)     Whether defendants breached any duty to convey material facts or to correct material acts previously disseminated;

(d)     Whether defendants participated in and pursued the fraudulent scheme to artificially inflate stock prices;

(e)     Whether the defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

(f)     Whether the market prices of the CornerStone's securities during the Class Period were artificially inflated due to material non-disclosures and/or misrepresentations complained of herein; and

(g)     Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### Background

25.     The Partnership is a Delaware limited partnership formed in December 1996.

CornerStone is the nation's sixth largest retail propane marketer, serving more than 440,000 retail propane customers in over 30 states.  The Partnership's two principal business segments are its retail and Coast Energy Group ("CEG") operations.  The retail segment includes propane sales, principally to end-users; repair and maintenance of propane heating systems and appliances; and the sale of propane-related supplies, appliances and other equipment.  CEG provides supply, marketing, and distribution services to other resellers of propane and end-users.  Principal products are propane, other natural gas liquids, crude oil, and natural gas.

26.     On November 20, 1998, the Partnership refinanced its then existing Bank Credit Facility under the terms of a new Bank Refunding Credit Agreement (the "Credit Agreement"). The Credit Agreement was subsequently amended effective June 30, 2000 to provide greater flexibility with respect to the financial covenants under the original Credit Agreement.  The Credit Agreement provided that there must be less than $10.0 million outstanding under the Working Capital Facility (excluding letters of credit) for at least 30 consecutive days during each fiscal year.  The Acquisition Facility under the Credit Agreement provided the ability to borrow up to $35 million to finance business acquisitions and growth capital expenditures.  The Acquisition Facility operated as a revolving facility through November 30, 2001, at which time any loans then outstanding may be converted to term loans and be amortized quarterly for a period of two years thereafter.

27.     Throughout the time prior to CornerStone's Banking Facility's expiration (November 30, 2001), the Partnership continually reported that it was a viable and healthy company with solid financial results.  These representations by the Partnership ultimately lead to CornerStone being able to find a replacement bank facility.

28.     On November 30, 2001, CornerStone announced that it completed the replacement of a bank facility.  At that time, the Partnership had completed an agreement for a $50 million lending facility to replace the $80.7 million bank credit agreement.  The new credit agreement extended through November 28, 2002, provided certain provisions and covenants are met, and included a revolving credit and term loan commitment.

29.     On February 11, 2003, the Partnership revealed in its 8-K filed with SEC that it

complaint.wpd

1   had to restate its financial results for fiscal years 2000 and 2001 due to the Partnership's

2   knowledge of known errors in reporting its financial results for fiscal years 2000 and 2001.

3   ### Materially False and Misleading Statements Made During the Class Period

4       30.    The Class Period commences on November 2, 1999. On that date, the Partnership

5   issued a press release with the headline: "CornerStone Propane Partners, L.P. Reports 70%

6   Increase in Earnings Before Interest, Taxes, Depreciation and Amortization For the First Quarter

7   of Fiscal 2000." Therein, CornerStone reported EBITDA of $1.7 million for the quarter ended

8   September 30, 1999. This represented an increase of $.7 million (approximately 70%) over the

9   $1.0 million reported for the same period last year. The Partnership further reported revenue for

10  the first quarter increased to $556.5 million, up $386.5 million over the $170.0 reported for the

11  same quarter of 1999. This increase was primarily due to incremental CEG sales volumes and

12  revenues (approximately $372.7 million) and increased retail sales activity (approximately $13.8

13  million). Recent CEG acquisitions had continued the Partnership's ongoing strategic focus to

14  increase its non-retail sales activities, providing incremental cash flow and a better balance of

15  business with the retail operations which are more dependent on a normal winter heating season.

16  Commenting on these results, defendant Baxter stated: "CornerStone continues to lead the

17  industry with both increased market share in existing markets and acquisitions into new

18  geographical markets, [and] [i]n addition, our continued focus on basic execution of fundamental

19  business practices has increased our EBITDA per unit and gross margin per employee."

20      31.    On November 12, 1999, the Partnership filed its Form 10-Q with the SEC.

21  Therein, the Partnership reiterated its previously announced financial results. The form was

22  signed by defendants Goedde and Nye. In the notes to the consolidated financial statements

23  contained in the Form 10-Q, defendants represented that "in the opinion of management, all

24  adjustments necessary for a fair presentation of such consolidated financial statements have been

25  reflected in the interim periods presented. Such adjustments consisted only of normal recurring

26  items."

27      32.    On February 3, 2000, CornerStone issued a press release to announce its results

28  for the second quarter of fiscal year 2000. Therein, the Partnership announced the following:

CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

[The Partnership] reported EBITDA of $27.6 million for the quarter ended December 31, 1999. This represents an increase of $11.6 million (approximately 73%) over the $16.0 million reported for the same quarter last year. The average EBITDA per equivalent common unit of $1.18 for the quarter was up $.48 per equivalent common unit (approximately 53%) as compared to $.77 for the same period last year.

Revenue for the quarter increased to $929.3 million, up $705.2 million over the $224.1 million reported for the second quarter of last year. This increase was due primarily to incremental CEG energy sales volumes and retail propane revenues (approximately $679.7 million) related to our acquisitions completed in this business segment over the past year. In addition, the Partnership increased its retail sales activity approximately $25.5 million. Recent CEG acquisitions have continued the Partnership's on-going strategic focus to increase its less weather sensitive non-retail sales activities, providing incremental cash flow and a better balance of business with the retail operations which have a greater dependence on a normal winter heating season.

Operating expenses for the quarter totaled $36.7 million, an increase of $6.4 million (approximately 21%) over the same quarter last year. This increase was related primarily to the acquisitions consummated by the Partnership over the past year, the largest of which was the purchase of Propane Continental, Inc. (formerly the nation's nineteenth largest propane company) in December 1998. These acquisitions contributed significantly to the increased cash flows for the most recent quarter, despite temperatures that were approximately 14% warmer than normal and 2% warmer than the record mild fiscal quarter of last year in markets served by the Partnership.

Second quarter retail sales volumes of 86.5 million gallons represented an increase of 12.9 million gallons (about 18%) over the 73.6 million gallons reported for the second quarter of last year. These gains were achieved despite a very mild start to the fiscal 2000 heating season, which depressed weather related sales volumes in all parts of the country. This past fall, sales volumes were also adversely impacted by a very weak agricultural crop-drying season related to lower rainfall than normal. The net sales volume increases reflect the continuing contributions from acquisitions and the Partnership's internal customer growth strategy. During the first six months of fiscal 2000 CornerStone added over 17,500 net new customers from internal growth, representing an annualized internal growth rate of just over 7.5%.

Despite an extremely warm fall, which adversely impacted sales to our higher margin residential customers and significant product cost increases, CornerStone was able to increase the average EBITDA per retail gallon by just over $.10, approximately 47%, from $.22 per retail gallon for the quarter ended December 31, 1998, to $.32 per retail gallon for the quarter ended December 31, 1999.

***

Net income for the quarter of $8.7 million was up $4.2 million (approximately 94%) over the $4.5 million reported in the second quarter of last year. This equates to an earnings per unit of approximately $.36 as compared to $.21 for the second quarter for fiscal 1999, an increase of

complaint.wpd

$.15 per unit or about 71%.

Commenting on these results, defendant Baxter stated:

> Despite the continuing mild weather patterns, I am very pleased with the accomplishments we have achieved through our continuing acquisition efforts and customer service internal growth programs. Additionally, we have been gradually expanding our non-weather sensitive business focus, making measurable progress away from our high weather dependency into related products and services at both the retail and [CEG] levels. We have also begun programs that are expected to improve our retail routing efficiencies and reduce our per gallon delivery costs, [and] [o]ur focus will continue on identifying and acquiring businesses that provide attractive accretive cash flows and basic execution of fundamental business practices to increase our EBITDA per unit and gross profit contribution per employee.

33.     On February 11, 2000, the Partnership filed its Form 10-Q with the SEC. Therein, the Partnership reiterated its previously announced financial results. The form was signed by defendants Goedde and Nye. In the notes to the consolidated financial statements contained in the Form 10-Q, defendants represented that "in the opinion of management, all adjustments necessary for a fair presentation of such consolidated financial statements have been reflected in the interim periods presented. Such adjustments consisted only of normal recurring items."

34.     On May 3, 2000, the Partnership issued a press release with the headline: "CornerStone Propane Partners, L.P. Reports 11% Increase in Earnings Before Interest, Taxes, Depreciation and Amortization for FY 2000 Third Quarter." Therein, the Partnership reported that Fiscal 2000 third quarter EBITDA increased 11 percent to $39.8 million compared with $35.9 million for the same quarter last year. Average EBITDA per equivalent common unit increased $.16 per unit to $1.70 compared with $1.54 for the same period last year. Additionally, CornerStone reported that revenue for the quarter increased $771 million to $1.1 billion compared with revenue of $339 million for the third quarter of last year. This increase was primarily due to incremental CEG energy product and service sales volume increases and retail propane revenues related to higher energy prices and acquisitions completed over the past year.

Commenting on these results, defendant Baxter stated:

> Despite significant winter product cost increases and record warm temperatures across the nation, EBITDA per unit increased by 10 percent and EBITDA per retail gallon increased by $.05 compared to last year's third quarter. These accomplishments are a direct result of continuing

improvements in our operating efficiencies, expansion of our non-retail sales activities, and increased cash flows from acquisitions and internal growth, which more than offset the adverse impact of warm weather on CornerStone's higher margin residential retail sales volumes. During the third quarter of Fiscal 2000, temperatures (as measured by heating degree days) were 17% and 7% warmer than both normal and prior year in markets served by the Partnership.

35.     On May 12, 2000, the Partnership filed its Form 10-Q with the SEC. Therein, the Partnership reiterated its previously announced financial results. The form was signed by defendants Goedde and Nye. In the notes to the consolidated financial statements contained in the Form 10-Q, defendants represented that "in the opinion of management, all adjustments necessary for a fair presentation of such consolidated financial statements have been reflected in the interim periods presented. Such adjustments consisted only of normal recurring items."

36.     On August 2, 2000, CornerStone issued a press release entitled "CornerStone Propane Partners, L.P. Announces Results for FY 2000 and 4th Quarter 2000." The press release, in part, stated:

> CornerStone . . . reported results for its fiscal year ended June 30, 2000. For the year, the reported EBITDA increased 11.6 percent to $64.2 million compared with $57.5 million for fiscal 1999. Average EBITDA per equivalent common unit increased $ .10 per unit to $2.74 compared with $2.64 for last year. The fourth quarter EBITDA for fiscal 2000 was below fiscal 1999 by approximately $9.5 million, reflecting continued effects of warm weather and certain discontinued operations at [CEG].

> Keith G. Baxter, President and Chief Executive Officer of CornerStone, said, "This past quarter and year have been challenging for the Partnership due to the combination of record warm winter conditions and elevated product costs. Many of CornerStone's residential customers are located in areas that experienced more extreme departures from normal winter weather patterns than the national averages. Nationally this past winter was about 9% warmer than normal. In the markets served by CornerStone the average winter temperatures were over 15% warmer than normal. Given the Partnership's high retail sales concentration on the residential customer, these mild weather conditions significantly affected earnings due to reduced sales volumes to our higher margin residential retail customers. Additionally, while our CEG division exceeded last years EBITDA, its results were reduced due to a discontinued component of its gas business. In light of the unprecedented adverse weather conditions facing the propane industry, I am extremely proud of our year over year improvement in EBITDA."

> Revenue for the year and quarter increased by $2.5 billion and $.7 billion respectively, to $3.7 billion for the year and $1.1 billion for the fourth quarter, respectively. These increases were due primarily to incremental [CEG] energy product and service sales volume increases. Retail propane revenues increased by 28% and 13% for the year and quarter, related to

both higher energy prices this past year and acquisitions completed late last year and early this year.

\*\*\*

Net income for the year and quarter decreased by $10.9 million and $8.8 million respectively (before non-recurring charges).  Several factors, according to Baxter, contributed to the decline: "The Partnership's retail operations have experienced three warmer-than-normal winters in a row, the last of which was the warmest on record, followed by the warmest spring on record.  In addition, commodity prices were unusually high during the season, interest costs increased as a result of higher product costs as well as a rise in interest rates themselves, and a non-recurring loss was sustained in connection with a discontinued gas operation at CEG."

During fiscal 2000 CornerStone added over 15,000 net new customers from internal growth, representing an annual internal growth rate of just over 4.0%.  It has added over 45,000 customers through internal growth initiatives since the Partnership was created three and one-half years ago.

**Baxter also stated: "The Partnership . . . has established a financing program with our banking syndicate.  These arrangements, together with existing equity and debt funding capabilities, are expected to provide the Partnership adequate sources of capital to meet its operating needs through FY2001."**

(Emphasis added).

37.     CornerStone's financial results for fiscal year 2000 were repeated in the Partnership's Report on Form 10-K filed with the SEC on or about September 28, 2000, which was signed by defendants Baxter, Goedde, and Nye.  Therein, the defendants reported that  the "financial statements referred to above present fairly, in all material respects, the financial position of CornerStone Propane Partners, L.P. and Subsidiary as of June 30, 2000 and 1999, and the results of their operations and their cash flows for the years ended June 30, 2000, 1999 and 1998, in conformity with accounting principles generally accepted in the United States."

38.     On November 14, 2000, the Partnership announced its first quarter fiscal year 2001 results through its Form 10-Q filing with the SEC.  Therein, the Partnership reported that revenues increased by $539.8 million or 97.0% to $1,096.3 million.  The Partnership attributed this increase to an increase in CEG revenues of $528.1 million or 104.9% to $1,031.6 million.  The Partnership further reported that the revenues for the retail business increased by $11.7 million or 22.1% to $64.7 million.  This primarily reflected the increase in propane selling prices in response to product cost increases, combined with increased revenue from business

1   acquisitions and non-weather sensitive sales, offset by the decrease in weather related sales

2   volumes.  The Partnership also reported that gross profit increased $3.0 million or 8.5% to $38.1

3   million.  The form was signed by defendants Goedde and Nye.  Additionally, in the notes to the

4   consolidated financial statements contained in the Form 10-Q, defendants represented that "in

5   the opinion of management, all adjustments necessary for a fair presentation of such

6   consolidated financial statements have been reflected in the interim periods presented.  Such

7   adjustments consisted only of normal recurring items."

8        39.     On February 7, 2001, the Partnership issued a press release to announce its

9   second quarter fiscal year 2001 results.  Therein, CornerStone reported EBITDA of $32.6

10   million for the quarter ended December 31, 2000.  This represented an increase of $5.0 million

11   (18.0%) over the $27.6 million reported for the same period last year.  For the year-to-date

12   EBITDA was better that last year by approximately $11.2 million or about 38%.  The

13   Partnership further reported that revenue for the quarter increased to $1,815.5 million, up $886.2

14   million over the $929.3 million reported for the 1999 quarter.  This increase was due primarily

15   to incremental CEG sales volumes and revenues (approximately $846.9 million) and increased

16   retail sales activity (approximately $39.4 million).  Both CEG and retail higher revenues

17   reflected the impact of substantial increases in energy prices.  In response to low national

18   inventory levels and high weather related demand, the Partnership reported that most energy

19   prices escalated sharply in the Partnership's second fiscal quarter.  Generally, these higher

20   product cost increases were passed along in the form of higher selling prices.  These same

21   factors accounted for the six month sales increases.  Revenues of $2.9 billion, were up

22   approximately $1.4 billion (about 96%) over last year.  Moreover, the Partnership reported

23   second quarter retail sales volumes of 92.1 million gallons represented an increase of 5.6 million

24   gallons (about 6.5%) from the 86.5 million gallons reported for the same period last year.  This

25   sales volume increase reflected the benefit of cold December temperatures that were offset in

26   part by a warm October and early November.  Additionally, record high commodity prices for

27   propane and other energy sources have provided a strong incentive for customers to conserve on

28   energy usage.  For the six months ending December 31, 2000, retail sales topped 138.0 million

CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

1    gallons, up 5.2 million gallons, or about 4.0% over the same period.  All of this increase was

2    related to a colder than last year and colder than normal December of 2000.  Commenting on

3    these results, defendant Baxter stated:

> These outstanding results for the quarter, driven primarily by the month of December, validate the Partnership's consistent strategic themes:
>
> High percentage of residential customers in the retail propane business enhances margin management in the face of rapidly rising fuel prices
>
> Growth of non-weather sensitive gross profit is additive in both warm and cold weather;
>
> Strong logistic business creates security of supply and enhances customer service when supply disruptions occur; [and]
>
> Increases in distributable cash have followed the successful implementation of the above
>
> He concluded, [t]he results of these initiatives consistently applied by all our team members have made this quarter's results a record achievement in the life of the Partnership.  I would like to publicly thank the thousands of CNO employees who have worked long and hard to provide incredibly reliable service to our customers.

15       40.    On February 13, 2001, the Partnership filed its Form 10-Q with the SEC.

16    Therein, the Partnership reiterated its previously announced financial results.  The form was

17    signed by defendants Goedde and Nye.  In the notes to the consolidated financial statements

18    contained in the Form 10-Q, defendants represented that "in the opinion of management, all

19    adjustments necessary for a fair presentation of such consolidated financial statements have

20    been reflected in the interim periods presented.  Such adjustments consisted only of normal

21    recurring items."

22       41.    On May 3, 2001, CornerStone issued a press release with the headline:

23    "CornerStone Propane Partners, L.P. Reports 33.7% Increase in Retail EBITDA for the Third

24    Quarter of Fiscal 2001."  The Partnership's release, in pertinent part, stated:

> CornerStone . . . today reported retail EBITDA of $43.3 million for the quarter ended March 31, 2001.  This represents an increase of $10.9 million (33.7%) over the $32.4 million reported for the same period last year.  Total Partnership EBITDA for the quarter was $41.8 million, an increase of $2.0 million over the same quarter of last year.  For the year to date, consolidated EBITDA was better than last year by approximately $13.3 million or about 19.2%.

Remarking on the third quarter, Keith G. Baxter, chief executive officer, stated, "These outstanding retail results for the quarter and the year to date show how well the Partnership can perform with just a little help from the weather. Although the deviation was only 5-6% cooler than normal, the retail business has generated a 31% increase in EBITDA for the first nine months of the year. This has been accomplished despite the reduction in volume brought about by fervent conservation and curtailment of deliveries due to credit as a result of the record high energy prices. We continue to be driven by the following beliefs:

· A high percentage of residential customers in the retail propane business enhances margin management in the face of rapidly rising fuel prices

· Growth of non-weather sensitive gross profit is additive in both warm and cold weather

· A strong logistic business creates security of supply and enhances customer service when supply disruptions occur

· A focus on operational excellence at the level of customer interaction yields superior results

· Increases in distributable cash have followed the successful implementation of the above."

Baxter concluded, "The results of these initiatives consistently applied by all our team members have made this quarter's results a record achievement in the life of the Partnership. I would like to publicly thank the thousands of CNO employees who have worked long and hard to provide incredibly reliable service to our customers."

Revenue for the quarter decreased by about $245.0 million to $864.5 million, from the $1.1 billion reported for the 2000 quarter. This decrease was due primarily to decreased sales volumes associated with the sale of our CEG Canadian crude oil gathering activities (with revenues of approximately $300.0 million for the third quarter of last year). Retail revenues were up about $38.5 million (29%) to $171.7 million reflecting the impact of higher propane product costs and profits which translated into higher selling prices. Both the CEG (excluding the Canadian crude oil gathering operations) and retail revenue increases were directly related to the impact of substantial energy price escalation for the current fiscal year in comparison to last year.

42.   On May 14, 2001, the Partnership filed its Form 10-Q with the SEC. Therein, the Partnership reiterated its previously announced financial results. The form was signed by defendants Goedde and Nye. In the notes to the consolidated financial statements contained in the Form 10-Q, defendants represented that "in the opinion of management, all adjustments necessary for a fair presentation of such consolidated financial statements have been reflected in the interim periods presented. Such adjustments consisted only of normal recurring items."

43.     The statements referenced above in ¶¶ 30-42 were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others  (1) that the Partnership had materially overstated its EBITDA, net income and earnings per unit to obtain a credit facility in order to maintain its business operations; (2) that the Partnership lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Partnership; and (3) that as a result, the value of the Partnership's EBITDA, net income and financial results were materially overstated at all relevant times.

44.     On July 27, 2001, after the close of the market, the Partnership shocked the market by issuing a press release to announce that formation of a special committee.  The press release, in pertinent part, stated:

> CornerStone . . . announced today that preliminary results for fiscal year 2001 are consistent with its 3rd quarter EBITDA projection of approximately $85 million, excluding non-recurring charges of $5.6 million.
>
> Keith G. Baxter, CEO stated, "Notwithstanding the indication of a solid year from an operating perspective, **management feels that it is both the right time and necessary to revisit the Partnership's strategy, its financial base, and how we can improve our balance sheet to better position ourselves for the future.**" Baxter continued, "Even with the improved EBITDA performance this year, we must **promptly address our increased overall level of debt and provide the Partnership with more financial flexibility to ensure continued value creation for our unitholders.**"
>
> As a part of this review, the Partnership also announced that a Special Committee of the General Partner's Board of Directors has been formed to assist the Board of Directors in a review of the Partnership's operating plan and capital structure.  The Committee consists of the directors who are not employees of the Partnership or the General Partner's parent, NorthWestern Corporation.  The Committee is conducting this review in conjunction with an effort by the Board and management to properly position future business operations and to improve the Partnership's leverage position and capital structure.  The Partnership has also investigated potential mergers or similar transactions, but is not considering offers at the present time.
>                                      * * *
> The Board of Directors and the management team believe this action is prudent and necessary, **particularly in light of the November 30, 2001 expiration of the Partnership's bank credit agreements and associated related-party bank support agreements.** In addition, **management believes that the fiscal 2002 operating plan and strategy must provide for increased financial flexibility due to its current debt levels and the unpredictable weather and product price swings that have affected the business over the past three years.** Finally, management is convinced that the dedicated commitment of its over 2,000 team members to serving their present and future customers with a continued level of superior service will be supported and enhanced with these actions.

complaint.wpd

(Emphasis added).

45.     On news of the announcement contained in ¶ 44, CornerStone's securities, on July 30, 2001, fell $7.40 to close at $9.05, its lowest closing price ever (at the time), on volume of 1.37 million, almost 35 times the three-month daily average.

46.     The Partnership's announcement contained in ¶ 44, failed, however, to tell the full story of the Partnership's financial health.  More specifically, the defendants failed to disclose and/or misrepresented the following adverse facts, among others  (1) that the Partnership had materially overstated its net income and earnings per unit so that the Partnership could gain a bank credit facility to maintain its operations; (2) that the Partnership lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Partnership; and (3) that as a result, the value of the Partnership's EBITDA, net income and financial results were materially overstated at all relevant times.

47.     Also on news of the announcement contained in ¶ 44, Ronald F. Londe, an analyst at A.G. Edwards, in a report dated August 3, 2001, declared that "this bad news demands a dramatic change in our recommendation to **SELL**/aggressive from **BUY**/aggressive."  (Emphasis in original.)

48.     On August 1, 2001, CornerStone issued a press release with the headline: "CornerStone Propane Partners, L.P. Reports Increased Operating Income and EBITDA For Fourth Quarter and Fiscal Year 2001."  Therein, the Partnership announced:

> CornerStone . . . reported total EBITDA of $3.4 million for the quarter ended June 30, 2001.  This represents an increase of $3.7 million over the $0.3 million loss reported for the same period last year.  For the entire fiscal year, EBITDA was $85.7 million versus $68.8 million last year, an increase of $16.9 million or 24.6%.
>
> Remarking on the fourth quarter, Keith G. Baxter, chief executive officer, stated, "CornerStone's operating results were much improved on both a quarter to quarter and a year to year comparison.  While gallons were essentially flat due to conservation driven by record high energy prices, both retail and wholesale gross profit were up a combined $6.1 million dollars or 19% for the quarter and $28.2 million or 13% for the year."
>
> Baxter also noted, "While the Partnership's total non-current liabilities decreased by $11.9 million, from $490.2 million to $478.3, the Partnership's funded debt still remains too high in relation to our repeatable cash flow, especially in light of the weakness of the economy.  It is management's goal to improve this imbalance by a combination of expense reductions, productivity improvements and prudent cash management."

\*\*\*

complaint.wpd

The timing of the action, following a solid operating performance in fiscal year 2001, was taken in recognition of the expiration of the Partnership's current working capital and acquisition credit facility on November 30, 2001, the requirement to reduce the leverage of the company to maintain future financial flexibility with replacement financing, and the general national economic uncertainties and resulting conservatism in the credit community.

***

Revenues for the quarter decreased to $430.0 million, from the $1.13 billion reported for the prior year quarter. This revenue reduction was due primarily to decreased sales volumes stemming from the December 2000 sale of CEG's Canadian crude oil gathering activities and lower domestic natural gas sales activities (impacting revenues by approximately $470 million and $126 million respectively). Retail revenues were up about $2.5 million (4.6%) to $56.4 million reflecting the impact of higher propane product costs and profits which translated into higher selling prices.

Fourth quarter retail sales volumes of 35.8 million gallons were down approximately 9.1% (or 3.6 million gallons) from the same quarter of last year. This decline reflects the continued impact of customer conservation in response to high selling prices plus reduced volumes related to our enforcement of customer credit terms.

Gross profit for the quarter increased $6.1 million (18.8%) compared to the prior year. The increase was principally driven by a higher gross profit from CEG's Canadian natural gas activities. In addition, Retail's gross profit grew $1.0 million, up 3.7% for the quarter. Retail's gross profit on a per gallon basis increased approximately 9 cents per gallon, representing a 14% increase.

49.    On September 28, 2001, the Partnership filed a notification of late filing on Form 12b-25, which was signed by defendant Nye, with respect to its Form 10-K. Therein, the Partnership gave the following reasons for the late filing:

The audit of the financial statements of CornerStone Propane Partners, L.P. (the "Registrant") will not be completed by September 28, 2001, the last day for a timely filing of its Annual Report on Form 10-K for the fiscal year ended June 30, 2001, pursuant to Rule O-3 of the General Rules and Regulations under the Securities Exchange Act of 1934.

Registrant's auditors, Arthur Andersen, LLP, have not completed their audit and issued their report for the year ended June 30, 2001 to enable Registrant to timely file its Annual Report on Form 10-K by September 28, 2001. Registrant's auditors, Arthur Andersen, LLP, will not have sufficient time to complete their audit and issue their report for the year ended June 30, 2001 without unreasonable effort and expense.

50.    On October 9, 2001, the Partnership again filed a notification of late filing on Form 12b-25, which was signed by defendant Nye, with respect to its Form 10-K. Therein, the Partnership gave the following reasons for the late filing:

The audit of the financial statements of CornerStone Propane Partners, L.P. (the "Registrant") will not be completed by September 28, 2001, the last day for a timely filing of its Annual Report on Form 10-K for the fiscal year ended June 30, 2001, pursuant to Rule O-3 of the General Rules and Regulations under the Securities

1     Exchange Act of 1934.

2     Registrant's auditors, Arthur Andersen, LLP, have not completed their audit and issued their report for the year ended June 30, 2001 to enable Registrant to timely file its

3     Annual Report on Form 10-K by September 28, 2001.  Registrant's auditors, Arthur Andersen, LLP, will not have sufficient time to complete their audit and issue their

4     report for the year ended June 30, 2001 without unreasonable effort and expense.

5        51.      CornerStone's financial results for fiscal year 2001 were finally repeated in the

6 Partnership's Report on Form 10-K filed with the SEC on or about October 15, 2001, which was

7 signed by defendants Baxter and Nye.  Therein, the defendants reported that  the "financial

8 statements referred to above present fairly, in all material respects, the financial position of

9 CornerStone Propane Partners, L.P. and Subsidiary as of June 30, 2001 and 2000, and the

10 results of their operations and their cash flows for the years ended June 30, 2001, 2000, and

11 1999, in conformity with accounting principles generally accepted in the United States."

12        52.      The statements referenced above in ¶¶ 48-51 were each materially false and

13 misleading when made because they failed to disclose and/or misrepresented the following

14 adverse facts, among others (1) that the Partnership had materially overstated its EBITDA, net

15 income and earnings per unit to obtain capital credit from lenders; (2) that the Partnership

16 lacked adequate internal controls and was therefore unable to ascertain the true financial

17 condition of the Partnership; and (3) that as a result, the value of the Partnership's EBITDA, net

18 income and financial results were materially overstated at all relevant times.

19        53.      Although the Partnership's restatement of earnings, referenced in ¶ 29, supra and

20 ¶ 73, infra, only concerned fiscal years 2000 and 2001, the Partnership still continued to rely on

21 those results in order to obtain capital credit from lenders for fiscal year 2002 and beyond.

22        54.      For example, on November 5, 2001, the Partnership issued a press release to

23 announce first quarter fiscal year 2002 results.  Therein, the Partnership, in pertinent part, stated:

24     CornerStone . . . reported EBITDA from the Partnership's core retail propane operations were $5.3 million for its fiscal first quarter ended

25     Sept. 30, 2001, a 33 percent improvement over last year's quarter of $3.9 million.  However, the divestiture of certain assets reduced the

26     Partnership's total EBITDA to $2.9 million, a decrease from $6.7 million in the same quarter last year.

27

28     Revenues for the quarter decreased to $439.9 million, down $655.0 million from the $1.095 billion reported for the same quarter of last year.  This decrease was due primarily to the sale of CEG's Canadian crude oil

gathering business in December 2000. CEG is the commercial energy wholesale and integrated logistics division of CornerStone. Retail revenues of $57.3 million were down $5.9 million from the same quarter last year. The reduction in retail revenues stemmed from lower propane prices and fewer gallons sold compared to last year's quarter.

"Our fiscal first quarter traditionally represents less than 6 percent of our total Retail EBITDA for the year and should not be considered indicative of the coming winter heating season, in which the Partnership generates the majority of its cash flow," said Keith G. Baxter, CornerStone's president and CEO.

The Partnership recorded a net loss of $17.1 million or approximately 70 cents per unit, which was consistent with the seasonal nature of industry results. This compares to the $21.7 million loss, or 91 cents per unit, reported for the same quarter of last year. The improved operating loss for the current quarter was directly related to the cumulative effect of the adoption of SFAS No. 133, Accounting for Derivative Instruments and Hedging Activities, recorded in last year's first quarter, combined with lower depreciation, amortization, and interest expense. In addition, the prior year's first quarter had non-recurring losses relating to the closing of the natural gas financial trading activities of CEG.

Fiscal first quarter 2002 retail sales volumes were 42.7 million gallons, represented a decrease of 3.2 million gallons (about 7.0 percent) from the 45.9 million gallons reported for the same period last year. Retail gross margins were $29.6 million, up 5.5 percent from $28.0 million from last year's quarter.

Operating expenses for the quarter totaled $33.9 million, a decrease of $0.6 million (approximately 1.7 percent) from the same period last year. This decrease was related primarily to the sale of CEG's Canadian crude oil gathering business and related operating expenses. Retail and administrative expenses of $27.3 million were higher than the $26.8 million of the first quarter of last year. The Partnership is continuing to focus on reducing operating expenses; however, rising insurance costs, higher medical benefits costs and increased expenses associated with the planned capital restructuring partially offset reductions from other operating expenses. Supporting the reduction of controllable expenses, the CEG, retail and administrative operations reduced their salary and related expenses (the company's largest operating expense) by $0.6 million collectively.

55.     On November 13, 2001, the Partnership filed its Form 10-Q with the SEC. Therein, the Partnership reiterated its previously announced financial results. The form was signed by defendant Nye. In the notes to the consolidated financial statements contained in the Form 10-Q, defendants represented that "in the opinion of management, all adjustments necessary for a fair presentation of such consolidated financial statements have been reflected in the interim periods presented. Such adjustments consisted only of normal recurring items."

CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

56.     On November 30, 2001, CornerStone announced, in a press release, that it completed the replacement of a bank facility.  Therein, the Partnership reported that it had completed an agreement for a $50 million lending facility to replace the $80.7 million bank credit agreement.  The new credit agreement extends through November 28, 2002, provided certain provisions and covenants are met, and includes a revolving credit and term loan commitment.  Commenting on this news, the defendant Baxter stated:  "The credit facility . . . should provide CornerStone with adequate working capital to meet our anticipated operating needs as we continue to work to strengthen our balance sheet to gain further financial flexibility."

57.     The statements referenced above in ¶¶ 54-56 were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others  (1) that the Partnership had materially overstated its EBITDA, net income and earnings per unit to obtain a credit facility in order to maintain its business operations; (2) that the Partnership lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Partnership; and (3) that as a result, the value of the Partnership's EBITDA, net income and financial results were materially overstated at all relevant times.

58.     On January 18, 2002, after the close of the markets, the Partnership again shocked the markets with a press release with the headline of "CornerStone Propane To Pursue Strategic Options: Quarterly Distributions Eliminated As Result of Credit Agreement Amendment."  Therein, CornerStone announced that it has retained Credit Suisse First Boston Corporation to pursue strategic options, including the possible sale or merger of the Partnership. In addition, CornerStone reported that unprecedented mild winter weather during its fiscal second quarter, ending December 31, 2001, will negatively impact the Partnership's results to be announced on February 7, 2002.  Moreover, CornerStone reported:

> As a result of its financial performance in the December quarter, CornerStone determined that it would not likely be in compliance with certain covenants of its $50 million working capital facility credit agreement.  Subsequent discussions with the lenders of this facility have led to an amendment to the credit agreement that continues access to funding under the facility which matures on Nov. 28, 2002.  However, the

credit agreement amendment eliminates the ability of CornerStone to make further quarterly distributions during the term of the facility. Pursuant to the Partnership Agreement, the suspension of distributions under the defined Minimum Quarterly Distribution will be subject to arrearage privileges, so that no distribution will be made to the subordinated unitholders until the arrearages have been paid to the common unitholders.  CornerStone Propane Partners, L.P. has approximately 17.3 million common units outstanding.

[Commenting on the news, defendant Baxter stated:]  Following a detailed review of CornerStone's operating plan and capital structure, and in light of the Partnership's credit position, the General Partner's Board of Directors has determined that it is in the best interest of the Partnership's unitholders to consider strategic opportunities, including a possible sale or merger of the Partnership.

59.     News of this announcement hit the market on January 22, 2002.  On that day, the market swiftly reacted to the Partnership's news; CornerStone securities fell $4.84, or 68 percent, to $2.31 and traded as low as $2.06.

60.     The announcement by CornerStone contained in ¶ 58 failed, however, to tell the full story of the Partnership's financial health.  More specifically, the defendants failed to disclose and/or misrepresented the following adverse facts, among others (1) that the Partnership had materially overstated its net income and earnings per unit for fiscal years 2000 and 2001 and used those results as its sole means to obtain working capital from lenders; (2) that the Partnership lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Partnership; and (3) that as a result, the value of the Partnership's EBITDA,  net income and financial results were materially overstated at all relevant times.

61.     On February 6, 2002, the Partnership issued a press release with the headline: "CornerStone Propane Partners, L.P. Reports $21.4 Million in EBITDA Before Charges for Second Quarter of Fiscal 2002."  Therein, the Partnership reported EBITDA of $21.4 million for its fiscal second quarter ended December 31, 2001, compared with $32.7 million in the same period in 2000.   Results for the period were adversely affected by unprecedented mild winter weather.  The Partnership also reported a $9.7 million net loss for the fiscal second quarter or a loss of 40 cents per unit, compared with net income of $11.6 million or 48 cents per unit in the same period last year.  Fiscal second quarter 2001 results include a non-recurring charge of $10.9 million related to the sale of the West Texas crude pipeline operations, the exit of natural

1    gas businesses within CEG, and the disposition of certain customer service centers.  Once the

2    restructuring is completed at CEG, the remaining business will be the supply function for

3    CornerStone's retail operations and a wholesale, marketing and logistic business for natural gas

4    liquids (consisting primarily of propane).  The Partnership also announced the following

5    bombshell:

> As a result of its financial performance in fiscal second quarter, CornerStone determined it would not meet certain covenants of its $50 million working capital credit facility agreement.  CornerStone held discussions with the lenders of its credit facility which resulted in an amendment to the credit agreement that continues access to funds under the facility until it matures on Nov. 28, 2002.  However, the credit agreement amendment eliminates the ability of CornerStone to make further quarterly distributions to unitholders during the term of the facility.  Pursuant to the Partnership Agreement, the suspension of distributions under the defined Minimum Quarterly Distribution will be subject to arrearage privileges, so that no distributions will be made to subordinated unit holders until the arrearages have been paid to common unit holders.

> The Partnership has been notified by Fitch Ratings that the ratings of its senior notes at the Operating Limited Partnership level have been lowered from BBB- to BB and at the Master Limited Partnership level from BB to B+.

16        62.     On news of this announcement by the Partnership, units of CornerStone again

17   fell to class low levels.

18        63.     On February 13, 2002, the Partnership filed its Form 10-Q with the SEC.

19   Therein, the Partnership reiterated its previously announced financial results.  The form was

20   signed by defendant Nye.  In the notes to the consolidated financial statements contained in the

21   Form 10-Q, defendants represented that "in the opinion of management, all adjustments

22   necessary for a fair presentation of such consolidated financial statements have been reflected in

23   the interim periods presented.  Such adjustments consisted only of normal recurring items."

24        64.     On April 29, 2002, the Partnership, in a press release, reported EBITDA of $32.7

25   million for its fiscal third quarter ended March 31, 2002, compared with $42.7 million in the

26   same period in 2001.  The Partnership also reported net income of $10.7 million for the fiscal

27   third quarter or 44 cents per unit, compared with net income of $19.5 million, or 80 cents per

28   unit during the same period last year.  The Partnership further announced that revenues for

CornerStone's third fiscal quarter decreased to $277.2 million from $ 865.4 million reported for the same quarter last year. Fiscal year 2001 results were restated due to implementing SEC Staff Accounting Bulletin 101 effecting revenue recognition for tank rental revenues. While this restatement had no effect on the full fiscal year, the quarterly results were impacted by implementation of the new accounting procedures. In addition, the bank credit facility amount for the prior year was reclassified to current liabilities for comparison purposes.

65. On news of this announcement by the Partnership, units of CornerStone again fell to class low levels.

66. On May 14, 2002, the Partnership filed its Form 10-Q with the SEC. Therein, the Partnership reiterated its previously announced financial results. The form was signed by defendant Nye. In the notes to the consolidated financial statements contained in the Form 10-Q, defendants represented that "in the opinion of management, all adjustments necessary for a fair presentation of such consolidated financial statements have been reflected in the interim periods presented. Such adjustments consisted only of normal recurring items."

67. On July 31, 2002, the Partnership issued a press release with the headline: "CornerStone Propane Partners, L.P. Elects to Delay Bond Interest Payments While Continuing to Review Financial Restructuring and Strategic Options." Therein, the CornerStone announced that it is continuing to review its financial restructuring and strategic options. Consistent with this review process, CornerStone has elected to delay making the aggregate approximate $5.6 million interest payment on three classes of its Senior Secured Notes which is due on July 31, 2002. The note agreements governing these Senior Secured Notes contain a five (5) business day grace period with respect to the interest payments before the failure to make the interest payments would constitute an event of default under the note agreements.

68. On August 6, 2002, the Partnership announced that it has received notification from the NYSE that trading in its common units had been suspended and that its units would be removed from the NYSE's trading list. The trading suspension was effective immediately. The NYSE indicated that it would make appropriate filings with the Securities and Exchange Commission to remove the listing of the common units on the NYSE, pending completion of

applicable procedures. CornerStone reported that the NYSE's delisting action is not expected to affect its current operations or financial position.

69.     Also on August 6, 2002, the Partnership announced, in a press release, its decision not to issue an earnings release for its fiscal year ending June 30, 2002.

70.     On September 19, 2002, the Partnership filed a Current Report on Form 8-K to announce that it had not completed the preparation of the Partnership's financial statements related to the fiscal year ended June 30, 2002, and that it would be unable to prepare and file its annual report on Form 10-K for the fiscal year ended June 30, 2002 by the September 30, 2002 deadline. The forms was signed by defendant Solsvig.

71.     On November 19, 2002 the Partnership filed a Current Report on Form 8-K to announce that it would be unable to prepare and file its quarterly report on Form 10-Q for the period ended September 30, 2002 by the November 14, 2002 deadline. The Partnership has not yet filed the Form 10-K or the Form 10-Q. The form was signed by defendant Solsvig.

72.     During the Class Period, the statements disseminated by the Partnership were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others (1) that the Partnership had materially overstated its EBITDA, net income and earnings per unit to obtain capital credit from lenders; (2) that the Partnership lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Partnership; and (3) that as a result, the value of the Partnership's EBITDA  net income and financial results were materially overstated at all relevant times.

## THE TRUTH BEGINS TO EMERGE

73.     On February 11, 2003, the Partnership filed a Current Report on Form 8-K and revealed that CornerStone would restate its financial results for fiscal years 2000 and 2001. The form was signed by defendant Solsvig. Therein, the Partnership reported, in pertinent part:

> **Inability to Prepare and File Annual Report on Form 10-K and Quarterly Reports on Form 10-Q.** The Partnership has determined that its financial statements for the years ended June 30, 2001 and June 30, 2000, and the interim periods therein (collectively, the "Prior Period Financial Statements") need to be restated in accordance with the requirements of the Securities and Exchange Commission's rules and

regulations, due to matters described below. The Partnership is continuing to work to complete the preparation of the Partnership's financial statements for the fiscal year ended June 30, 2002. Deloitte & Touche has informed the Partnership that, in the event that Deloitte & Touche is able to complete its engagement to audit the Partnership's financial statements for the year ended June 30, 2002, based on present circumstances it is likely that any report issued in connection therewith would disclaim an opinion on the Consolidated Statement of Operations, Consolidated Statement of Cash Flows and Consolidated Statement of Partners' Capital to be included in the Partnership's financial statements for the fiscal year ended June 30, 2002. Further, Deloitte & Touche has informed the Partnership that the reason for its disclaimer referred to above is that Deloitte & Touche is not able to rely on the Partnership's financial statements for the year ended June 30, 2001, because the restatement of such financial statements as discussed below results in those financial statements being unaudited. Deloitte & Touche has advised the Partnership that it is unwilling to accept an audit engagement related to the Prior Period Financial Statements due to the following:

1) the existence of known errors (which are discussed in further detail below) in the Partnership's Prior Period Financial Statements; and

2) deficiencies in the Partnership's supporting records for fiscal year 2001 as reported to the Partnership in a letter received from its former auditor Arthur Andersen LLP, which has ceased operations, which notified the Partnership of material weaknesses in internal controls during the fiscal year ended June 30, 2001.

Further, Deloitte & Touche has advised the Partnership that it expects to issue a letter communicating material weaknesses in internal controls during the year ended June 30, 2002. Deloitte & Touche has informed the Partnership that based upon their work performed to date the contents of the letter will include a comment with respect to inadequate internal controls over property, plant and equipment.

In addition, Deloitte & Touche has informed the Partnership that, in the event that Deloitte & Touche is able to complete its engagement to audit the Partnership's financial statements for the year ended June 30, 2002, based on present circumstances it is likely that any report issued in connection therewith will contain an explanatory paragraph regarding substantial doubt about the ability of the Partnership to continue as a going concern. See the Partnership's Current Reports on Form 8-K referred to in the first paragraph of this Current Report for a discussion of the Partnership's operating and financial difficulties.

The Partnership does not believe that it will be able to complete and file an annual report on Form 10-K for the fiscal year ended June 30, 2002 that meets the Securities and Exchange Commission's requirements due to the Prior Period Financial Statements after the restatements described below not having been reaudited and the likely disclaimer on the Consolidated Statement of Operations, Consolidated Statement of Cash Flows and Consolidated Statement of Partners' Capital for the fiscal year ended June 30, 2002. In addition, the Partnership does not believe that it will be able to complete and file Quarterly Reports on Form 10-Q for the periods ended September 30, 2002 and December 31, 2002 (together, the "Form 10-Qs") that meet the Securities and Exchange Commission's

requirements.  The Partnership's inability to prepare and file the Form 10-Qs that meet Securities and Exchange Commission's requirements is due to the Partnership's inability to provide the comparative financial information found in the Prior Period Financial Statements which is required by Form 10-Q.  In light of the financial condition of the Partnership, the Partnership has not yet determined whether to seek to engage another accounting firm to audit prior years.

**Known Adjustments to and Need to Restate Prior Period Financial Statements**.  In preparing the financial statements for the fiscal year ended June 30, 2002, the Partnership has determined that certain errors arising from mistakes in the application of accounting principles, as discussed in Accounting Principle Board Opinion No. 20, Accounting Changes ("APB No. 20"), were made with respect to the Prior Period Financial Statements.  In accordance with APB No. 20 these errors would result in prior period adjustments.  The prior period adjustments which have been specifically identified and quantified to date relate to: (1) the allocation of purchase price as it relates to certain acquisitions dating back to 1997; and, (2) a change in the manner in which the Partnership recognized rental income on propane storage tanks.  The potential effects of these prior period adjustments are discussed in further detail below.  However, unless a reaudit is performed, the potential impact of the matters discussed in this Current Report on the Partnership's Prior Period Financial Statements cannot be fully determined as additional material adjustments to the Partnership's Prior Period Financial Statements may be required.  As noted above, Deloitte & Touche has advised the Partnership that it is unwilling to accept an engagement to audit the Partnership's financial statements for fiscal years ended prior to July 1, 2001.

The Partnership has determined, based on a review of records from a physical inventory of propane storage tanks conducted during November 2000 and the Partnership's current tank inventory records, that it is appropriate that amounts in the original allocations of purchase price related to propane storage tanks be reclassified to goodwill.  Specifically, the Partnership has determined that an adjustment of approximately $26.0 million to the initial purchase price allocations should be made and that such adjustments and related reclassification of accumulated depreciation to accumulated goodwill amortization of $2.3 million should be reflected on the Consolidated Balance Sheet as at June 30, 2000.  Additionally, the Partnership has determined that an adjustment of the Consolidated Balance Sheet as at June 30, 2001, including reclassification of accumulated depreciation of approximately $3.0 million related to propane storage tanks to accumulated goodwill amortization should be made.  Thus, the net increase in goodwill before the SFAS No. 142 write-off amount noted above would be approximately $23.0 million as of June 30, 2001.  Because the Partnership adopted SFAS No. 142 effective July 1, 2001 there is no impact on "Income (loss) before cumulative effect in accounting principle" for the year ended June 30, 2001 of ($9,124,000), as the Partnership previously amortized both goodwill and depreciated propane storage tanks both over a period of 40 years.  The effect on "Income (loss) before cumulative effect in accounting principle" for the nine months ended March 31, 2002 of ($16,148,000) is to decrease such loss by approximately $0.5 million due to an overstatement of propane storage tank depreciation.

complaint.wpd

The Partnership has reviewed the manner in which it reported and disclosed in the Partnership's annual report on Form 10-K for the fiscal year ended June 30, 2001 (the "2001 Form 10-K") the portion of the reported change in accounting principle as of July 1, 2000 related to recognition of rental income on propane storage tanks. The Partnership has determined that this portion of the change in accounting principle should have been reported as a correction of an error through an adjustment to retained earnings for the earliest date presented. The effect on the financial statements included in the 2001 Form 10-K of this determination by the Partnership would be a reduction in Partners' Capital at June 30, 1998 of approximately $2.4 million as presented on the Consolidated Statements of Partners' Capital and an increase on the Consolidated Balance Sheets of the deferred revenue liability by approximately $3.1 million as of June 30, 2001 and June 30, 2000. The effect on the fiscal year ended June 30, 2001 Consolidated Statement of Operations would be negligible. The effect on the Revenues, Operating Income (Loss) and Net Income (Loss) for the fiscal years ended June 30, 2000 and June 30, 1999 would be an estimated (decrease) of approximately $(0.4) million and $(0.3) million, respectively. The effect on the Fiscal 2001 quarterly Revenues, Operating Income (Loss) and Net Income (Loss) presented in Footnote 14. Quarterly Data (Unaudited) to the 2001 Form 10-K would be negligible. The effect on the Fiscal 2000 quarterly Revenues, Operating Income (Loss) and Net Income (Loss) presented in Footnote 14. Quarterly Data (Unaudited) to the 2001 Form 10-K would be an estimated increase (decrease) of approximately $(1.8) million, $0.2 million, $0.7 million and $0.5 million, for the quarters ended September 30, December 31, March 31 and June 30, respectively.

The Partnership is continuing to work with its advisors to review its financial, strategic and legal restructuring options.

(Emphasis in original.)

74.   On this news, units in the partnership fell to a Class Period low of $.40 per unit.

75.   Additionally, and after the close of the Class Period, on May 7, 2003, the Partnership issued a press release with the headline: "CornerStone Propane for Sale; Auditor Shuns Filings." Therein, the Partnership announced:

It has broadened the mandate of its financial advisor, Greenhill & Co., LLC, to assist CornerStone in evaluating a wide range of options regarding its future, including a possible sale of the company.

"After a strong performance with improved operations, we have begun a process of looking at all alternatives to maximize value, including a possible sale of the company," said CornerStone's Chief Executive Officer Curt Solsvig. "We expect this process may last several months."

He added, "Improved results during the winter and the sale of the final portion of our wholesale operations in November significantly strengthened CornerStone's liquidity. Improvements achieved over the past several months have better positioned CornerStone for the future although the company still faces significant long-term liquidity issues."

Since last summer, CornerStone has implemented several strategic initiatives that have reduced costs, capital expenditures and working capital needs under the guidance of a management team from the turnaround firm of Everett & Solsvig, Inc.

## UNDISCLOSED ADVERSE INFORMATION

76.     The market for CornerStone securities was open, well-developed and efficient at all relevant times during the Class Period.  As a result of these materially false and misleading statements and failures to disclose, the Partnership's securities traded at artificially inflated prices during the Class Period.  The artificial inflation continued until the time the Partnership announced  that it was restating its financial results for the fiscal years 2000 and 2001, and this fact was communicated to, and/or digested by, the securities markets.  Plaintiff and other members of the Class purchased or otherwise acquired CornerStone securities relying upon the integrity of the market price of CornerStone securities and market information relating to CornerStone, and have been damaged thereby.

77.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of CornerStone securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CornerStone and the Partnership's business and operations, including, *inter alia*:

        (a)     What was unknown to investing community was that the following:

                (1)     its financial results for the fiscal years 2000 and 2001 were materially overstated; and

                (2)     that the overstatement of earnings was a result of the Partnership's quest to obtain a banking facility for capital credit, which the Partnership needed in order to maintain business operations; and

        (b)     Despite the apparent credibility of the disclosure given by CornerStone during the Class Period, the Partnership continued to misrepresent and conceal its true financial results.

complaint.wpd

78.     At all relevant times, the material misrepresentations and omissions partic-
ularized in this Complaint directly or proximately caused or were a substantial contributing
cause of the damages sustained by Plaintiff and other members of the Class.  As described
herein, during the Class Period, defendants made or caused to be made a series of materially
false or misleading statements about CornerStone's business, prospects and operations.  These
material misstatements and omissions had the cause and effect of creating in the market an
unrealistically positive assessment of CornerStone and its business, prospects and operations,
thus causing the Partnership's securities to be overvalued and artificially inflated at all relevant
times.  Defendants' materially false and misleading statements during the Class Period resulted
in Plaintiff and other members of the Class purchasing the Partnership's securities at artificially
inflated prices, thus causing the damages complained of herein.

**SCIENTER ALLEGATIONS**

79.     As alleged herein, defendants acted with scienter in that defendants knew that the
public documents and statements, issued or disseminated by or in the name of the Partnership
were materially false and misleading; knew or recklessly disregarded that such statements or
documents would be issued or disseminated to the investing public; and knowingly and
substantially participated or acquiesced in the issuance or dissemination of such statements or
documents as primary violators of the federal securities laws.  As set forth elsewhere herein in
detail, defendants, by virtue of their receipt of information reflecting the true facts regarding
CornerStone and its business practices, their control over and/or receipt of CornerStone's
allegedly materially misleading misstatements and/or their associations with the Partnership
which made them privy to confidential proprietary information concerning CornerStone were
active and culpable participants in the fraudulent scheme alleged herein.

80.     Defendants knew and/or recklessly disregarded the falsity and misleading nature
of the information which they caused to be disseminated to the investing public.  The ongoing
fraudulent scheme described in this complaint could not have been perpetrated over a substantial
period of time, as has occurred, without the knowledge and complicity of the personnel at the
highest level of the Partnership, including the Individual Defendants.

81.     Moreover, defendants knew or should have known that without overstating its earnings per unit, the Partnership would be forced to liquidate all assets because no lender would provide them with capital credit.

82.     Additionally during the Class Period, defendant Goedde, the Partnership's Chief Financial Officer, engaged in a series of insider trading.  The extent of the insider trading is shown below:

| Date | Shares/Transaction |
|------|--------------------|
| April 4, 2001 | 1,300 shares sold for $20,215 |
| April 5, 2001 | 2,500 shares sold for $39,750 |
| April 10, 2001 | 1,700 shares sold for $27,234 |
| April 11, 2001 | 1,700 shares sold for $27,200 |
| April 12, 2001 | 1,000 shares sold for $16,250 |
| April 17,2001 | 13,500 shares sold for $215,530 |
| May 3, 2001 | 2,000 shares sold for $34,800 |
| May 9, 2001 | 1,000 shares sold for $16,220 |
| May 12, 2001 | 1,000 shares sold for $16,900 |
| May 17, 2001 | 1,000 shares sold for $16,650 |
| May 17, 2001 | 8,000 shares sold for $134,830 |
| TOTALS: | 34,7000 shares sold for proceeds of $565,579 |

## STATUTORY SAFE HARBOR

83.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made.  Nor was it stated that actual results "could differ materially from those projected."  Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement

1   was false and the forward-looking statement was authorized and/or approved by an executive

2   officer of CornerStone who knew that those statements were false when made.

3   ### APPLICABILITY OF PRESUMPTION OF RELIANCE:
    ### FRAUD-ON-THE-MARKET DOCTRINE

4

5   84.   At all relevant times, the market for CornerStone's securities was an efficient

6   market for the following reasons, among others:

7   (a)   CornerStone's securities met the requirements for listing, and was listed

8   and actively traded on the NYSE and OTC, a highly efficient and automated market;

9   (b)   As a regulated issuer, CornerStone filed periodic public reports with the

10  SEC and the NYSE and OTC;

11  (c)   CornerStone regularly communicated with public investors via

12  established market communication mechanisms, including the regular disseminations of press

13  releases on the national circuits of major newswire services and through other wide-ranging

14  public disclosures, such as communications with the financial press and other similar reporting

15  services. Each of these releases was publicly available and entered into the marketplace; and

16  (d)   CornerStone was followed by securities analysts employed by major

17  brokerage firms who wrote reports which were distributed to the sales force and certain

18  customers of their respective brokerage firms. Each of these reports were publicly available and

19  entered the public marketplace.

20  85.   As a result of the foregoing, the market for CornerStone's securities promptly

21  digested current information regarding CornerStone from all publicly available sources and

22  reflected such information in CornerStone's securities pricing. Under these circumstances, all

23  purchasers of CornerStone's securities during the Class Period suffered similar injury through

24  their purchase of CornerStone's securities at artificially inflated prices and a presumption of

25  reliance applies.

26  ///

27  ///

28  ///

## FIRST CLAIM

### Breach of Fiduciary Duty Against All Defendants

86.     Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein. This claim is asserted against all defendants.

87.     Defendants owed a fiduciary duty to the Class, as purchasers and owners of CornerStone stock.

88.     Defendants, by means of their making the foregoing false and misleading statements, breached their fiduciary duty to the Class.

## SECOND CLAIM

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

89.     Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein. This claim is asserted against all defendants.

90.     During the Class Period, defendant CornerStone and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of CornerStone's securities; and (c) cause plaintiff and other members of the Class to purchase CornerStone's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants CornerStone and the Individual Defendants, and each of them, took the actions set forth herein.

91.     These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Partnership's securities in an effort to maintain artificially high market prices for CornerStone's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of CornerStone, as alleged below.

92.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Partnership's operations, financial condition and performance so that the market prices of the Partnership's publicly traded securities would be based on truthful, complete and accurate information.

93.     CornerStone and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of CornerStone as specified herein.

94.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CornerStone's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CornerStone and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of CornerStone's securities during the Class Period.

95.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) each of the Individual Defendants was a high-level executive and/or director at the Partnership during the Class Period; (b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or

1  director of the Partnership, was privy to and participated in the creation, development and

2  reporting of the Partnership's internal budgets, plans, projections and/or reports; (c) the

3  Individual Defendants enjoyed significant personal contact and familiarity with each other and

4  were advised of and had access to other members of the Partnership's management team,

5  internal reports, and other data and information about the Partnership's financial condition and

6  performance at all relevant times; and (d) the Individual Defendants were aware of the

7  Partnership's dissemination of information to the investing public which they knew or recklessly

8  disregarded was materially false and misleading.

9       96.    These defendants had actual knowledge of the misrepresentations and omissions

10  of material facts set forth herein, or acted with reckless disregard for the truth in that they failed

11  to ascertain and to disclose such facts, even though such facts were available to them. Such

12  defendants' material misrepresentations and/or omissions were done knowingly or recklessly

13  and for the purpose and effect of concealing CornerStone's operating condition, business

14  practices and future business prospects from the investing public and supporting the artificially

15  inflated price of its securities. As demonstrated by defendants' overstatements and

16  misstatements of the Partnership's financial condition and performance throughout the Class

17  Period, the Individual Defendants, if they did not have actual knowledge of the

18  misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by

19  deliberately refraining from taking those steps necessary to discover whether those statements

20  were false or misleading.

21       97.    As a result of the dissemination of the materially false and misleading

22  information and failure to disclose material facts, as set forth above, the market price of

23  CornerStone's securities were artificially inflated during the Class Period. In ignorance of the

24  fact that market prices of CornerStone's publicly-traded securities were artificially inflated, and

25  relying directly or indirectly on the false and misleading statements made by defendants, or upon

26  the integrity of the market in which the securities trade, and/or on the absence of material

27  adverse information that was known to or recklessly disregarded by defendants but not disclosed

28  in public statements by defendants during the Class Period, plaintiff and the other members of

1  the Class acquired CornerStone securities during the Class Period at artificially high prices and

2  were damaged thereby.

3       98.    At the time of said misrepresentations and omissions, plaintiff and other

4  members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff

5  and the other members of the Class and the marketplace known of the true performance,

6  business practices, future prospects and intrinsic value of CornerStone, which were not

7  disclosed by defendants, plaintiff and other members of the Class would not have purchased or

8  otherwise acquired their CornerStone securities during the Class Period, or, if they had acquired

9  such securities during the Class Period, they would not have done so at the artificially inflated

10  prices which they paid.

11       99.    By virtue of the foregoing, CornerStone and the Individual Defendants have each

12  violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

13       100.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and

14  the other members of the Class suffered damages in connection with their respective purchases

15  and sales of the Partnership's securities during the Class Period.

16  **THIRD CLAIM**

17  **Violation Of Section 20(a) Of The Exchange Act Against**
**the Individual Defendants**

18

19       101.    Plaintiff repeats and reiterates the allegations as set forth above as if set forth

20  fully herein.  This claim is asserted against the Individual Defendants.

21       102.    Each of the Individual Defendants acted as a controlling person of CornerStone

22  within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their

23  high-level positions with the Partnership, participation in and/or awareness of the Partnership's

24  operations and/or intimate knowledge of the Partnership's actual performance, the Individual

25  Defendants had the power to influence and control and did influence and control, directly or

26  indirectly, the decision-making of the Partnership, including the content and dissemination of

27  the various statements which plaintiff contends are false and misleading.  Each of the Individual

28  Defendants was provided with or had unlimited access to copies of the Partnership's reports,

1  press releases, public filings and other statements alleged by plaintiff to be misleading prior to

2  and/or shortly after these statements were issued and had the ability to prevent the issuance of

3  the statements or cause the statements to be corrected.

4      103.   In addition, each of the Individual Defendants had direct involvement in the day-

5  to-day operations of the Partnership and, therefore, is presumed to have had the power to control

6  or influence the particular transactions giving rise to the securities violations as alleged herein,

7  and exercised the same.

8      104.   As set forth above, CornerStone and the Individual Defendants each violated

9  Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By

10  virtue of their controlling positions, the Individual Defendants are liable pursuant to Section

11  20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct,

12  plaintiff and other members of the Class suffered damages in connection with their purchases of

13  the Partnership's securities during the Class Period.

14                      **PRAYER FOR RELIEF**

15      105.   WHEREFORE, Plaintiff on behalf of himself and of the Class pray for relief and

16  judgment, as follows:

17          A.   Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3)

18  of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

19          B.   Awarding plaintiff and the members of the Class damages in an amount

20  which may be proven at trial, together with interest thereon;

21          C.   Awarding plaintiff and the members of the Class pre-judgment and post-

22  judgment interest, as well as their reasonable attorneys' and experts' witness fees and other

23  costs;

24          D.   Awarding such other and further relief as this Court may deem just and

25  proper including any extraordinary equitable and/or injunctive relief as permitted by law or

26  equity to attach, impound or otherwise restrict the defendants' assets to assure plaintiff has an

27  effective remedy; and

28          E.   Such other relief as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 28, 2003                    Respectfully submitted,

**GREEN & JIGARJIAN LLP**

By:  _Robert S. Green_
     Robert S. Green

Robert A. Jigarjian
235 Pine Street, 15th Floor
San Francisco, CA 94104
Telephone: (415) 477-6700
Facsimile: (415) 477-6710

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**CAULEY, GELLER, BOWMAN, COATES
& RUDMAN, LLP**
Samuel H. Rudman
David A. Rosenfeld
200 Broadhollow Road, Suite 406
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

**WEINSTEIN KITCHENOFF SCARLATO KARON
& GOLDMAN LTD.**
Paul J. Scarlato, Esquire
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone: (215) 545-7200
Facsimile: (215) 545-6535

Attorneys for Plaintiff

complaint.wpd

CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

Attorney Of Record
For Plaintiff Edward Erikson

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Edward Erikson, (Plaintiff) declares, as to the claims asserted under the federal securities laws, that:

1.   Plaintiff has reviewed the Complaint and retains Schiffrin & Barroway, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.   Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff's transactions in the Cornerstone Propane Partners L.P. (OTC: CNPP) security that is the subject of this action during the Class Period are as follows:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 100 | Sold | 11/30/01 | $6.95 |
| 100 | BOUGHT | 1/9/01 | $14,3125 |
| | | | |
| | | | |

List additional transactions on a separate sheet of paper, if necessary.

5.   During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws:  N/A

6.   Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21 day of ____MAY____, 2003.

_Edward S. Erikson_

EDWARD ERIKSON