UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re CORNERSTONE PROPANE
PARTNERS, L.P. SECURITIES LITIGATION

_____/

No. C 03-2522 MHP

**MEMORANDUM & ORDER**

Plaintiffs, a consolidated class led by Gilbert H. Lamphere, brought this action against defendants CornerStone Propane Partners L.P. ("CornerStone") and several of its top executives and directors ("individual defendants"), alleging that defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The action against CornerStone has been stayed pending bankruptcy proceedings. The class consists of purchasers of CornerStone common units during the period July 29, 1998 through and including February 11, 2003 (the "class period"). Now before the court is defendants William L. Woods and Charles J. Kittrell's second motion to dismiss for failure to state a claim. Having considered the arguments of the parties and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND[1]

On February 8, 2005, this court granted individual defendants' motion to dismiss plaintiffs' Corrected, Consolidated Class Action Complaint without prejudice. In re CornerStone Propane Partners L.P. Sec. Litig., 355 F. Supp. 2d 1069 (N.D. Cal. 2005) (Patel, J.). That order catalogued the factual

allegations, corporate structure, and statements at issue in this case, all of which are incorporated here by reference. Id. at 1072-75, 1076-80. Suffice it to say for present purposes that the general theory of fraud alleged in the complaint revolves around CornerStone's acquisition-based business strategy and financial reporting. Plaintiffs allege that an aggressive acquisition incentive program, fraudulent accounting and pricing of assets and acquisitions, the distortion of the partnership's true financial condition, and related-party transactions led to CornerStone's inevitable collapse.

In reaching its holding, the court emphasized several concerns with the complaint as drafted: use of the puzzle-style pleading format (allegedly false statements followed by a set of boilerplate allegations of falsity), unsubstantiated bases of confidential source's knowledge, and inadequate identification of what individual defendants knew and when they knew it. The order also identified the smaller problem of a lack of information regarding when auditors informed CornerStone management of centralization problems. Due to the extended class period in the action, the sheer quantity of public statements alleged to be misrepresentations, and the numerous sources upon which the class allegations were based, the court ordered plaintiffs to submit a chart summarizing each statement alleged to have been misleading, the reasons why it was misleading, and a statement alleging with particularity all facts on which that belief was formed. This court recognized that the failures in the complaint lay not in its raw content—which was replete with exhaustive detail about statements made over the course of the class period, financial data, varied sources, flow of internal information, specific instances of alleged fraud, and other particularized factual allegations—but rather in its coherence and pleading discipline.

Plaintiffs subsequently submitted the second amended complaint. At a case management conference on April 14, 2005, defendants expressed their intention to file a second motion to dismiss. On the basis of the court's careful review of the newly amended complaint and its finding of substantial and meaningful revisions to comply with the prior order, this court advised defendants against a second cycle of motions on behalf of all defendants. Defendants Baxter, Goedde, Hylland, Lewis, Newell, and Nye—each of whom signed SEC filings alleged to contain false statements—answered plaintiffs' second amended complaint on May 10, 2005. The present motion is filed only on behalf of individual officer defendants Woods and Kittrell.

Defendant Woods was CornerStone's Vice President of Acquisitions through the class period. Fraudulent conduct in the valuation and accounting of acquisitions is central to the complaint, but allegations specifically naming Woods relate only to the extent of his bonuses and other incentive compensation. Defendant Kittrell was the Executive Vice President, Secretary of the Managing General Partner, and Chief Operating Officer of CornerStone. The complaint specifically identifies Kitrell in a range of allegations, namely: the extent of his bonuses and other incentive compensation, the orchestrated manipulation of CornerStone acquisition costs and accounting methods, receipt of internal audits revealing false asset inventories, involvement in related party transactions, and departure from the company coincident with its public collapse.

Woods and Kittrell are the only individual defendants not alleged to have signed the partnership's SEC filings during the class period. The complaint does allege, however, that Woods and Kittrell are controlling persons liable under section 20(a) of the Securities and Exchange Act of 1934. Both defendants have moved to dismiss the second amended complaint for failure to adequately plead fraud and scienter, as well as failure to plead control person liability.

LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Because Rule 12(b)(6) focuses on the "sufficiency" of a claim rather than the claim's substantive merits, "[o]rdinarily, a court may look only at the face of the complaint to decide a motion to dismiss." Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002). Under Rule 12(b)(6), "unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief," a motion to dismiss must be denied. Lewis v. Telephone Employees Credit Union, 87 F.3d 1537, 1545 (9th Cir. 1996) (citation omitted); see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") significantly altered pleading requirements in private securities litigation in order to eliminate meritless claims. In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 988 (9th Cir. 1999). The statute requires that a securities fraud complaint must

plead both fraud and scienter. See 15 U.S.C. § 78u-4(b)(1)-(2). Plaintiffs must identify (1) each statement alleged to have been misleading, (2) the reason or reasons why the statement is misleading, and, (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. See 15 U.S.C. § 78u-4(b)(1); In re The Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002). Allegations are deemed to be held on information and belief, and thus subject to the particularity requirement, unless plaintiffs have personal knowledge of the facts. In re The Vantive, 283 F.3d at 1085, n.3. A complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit has defined the requisite state of mind as "deliberate recklessness, at minimum," and requires plaintiffs to plead "particular facts giving rise to a strong inference" of that mental state. See Silicon Graphics, 183 F.3d at 974. "When determining whether plaintiffs have shown a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002) (emphasis in original).

DISCUSSION

Defendants Woods and Kitrell move to dismiss the complaint against them on the basis of failure to plead with required particularity under the PSLRA, failure to allege facts giving rise to a strong inference of scienter, and failure to adequately plead liability as control persons. Plaintiffs argue that under the "group published information" doctrine, the statements alleged in the complaint are the collective actions of all individual defendants, including Woods and Kittrell, and that as alleged, the complaint states a claim for securities fraud and control liability against both defendants. I.    The Second Amended Complaint

Plaintiffs' second amended complaint is a substantially-revised effort to satisfy this court's previous order. In terms of the form of the complaint, plaintiffs have changed the pleading style to dramatically reduce the use of boilerplate allegations. See, e.g., Second Am. Compl. ¶¶ 115, 117, 121, 125. After each cluster of allegedly false statements, they have specified more particular reasons the statements were false at the time when made, including specific references to confidential sources, audits, and SEC filings

1 which demonstrate insider knowledge of falsity. Improvements on this score were also made through the
2 creation of a chart requested by the court. Following this court's instructions, plaintiffs emphasized a
3 chronology of statements and knowledge, i.e., clarifying why, at the time each statement was made,
4 defendants possessed contrary information at the time which would raise the inference of scienter. While
5 the chronology portrayed by the chart does not capture a seamless sequence of knowledge in lock step
6 with allegedly false statements, such a showing is not required by the PSLRA. The statute administers the
7 twin requirements of fraud and scienter rigorously and in parallel, but does not require omnipotence as to a
8 defendant's mental state at each moment of alleged misstatement. See generally 15 U.S.C. § 78u-4(b)(1)-
9 (2).

10 Equally as central to this court's prior order was the complaint's lack of foundation for each
11 confidential source's basis of knowledge, as well as greater specificity about their observations. Plaintiffs
12 have greatly substantiated these allegations, and indeed they have added two new confidential sources to
13 the complaint. It is worth discussing these sources' new or revised contributions to the complaint at length,
14 as they are the most important basis for this court's finding that the second amended complaint is
15 acceptable as written, at least with reference to certain individual defendants.

16 With regards to confidential witness FA1, the newly amended complaint specifies her professional
17 credentials, the dates of her employment with NorthWestern, her service as Interim Controller before her
18 resignation (including her chain of command in that position), and her resignation and reporting to the SEC
19 of wrongdoing, resulting in the on-going SEC investigation of NorthWestern. Second Am. Compl. ¶¶ 45-
20 48. Amendments to the complaint now improve the allegations of section 10(b) fraud liability by specifying
21 FA1's observations about the types of costs improperly shifted to acquisitions, including due diligence
22 costs, attorney's fees, investment banking costs, and travel costs, as well as the effects of the treatment of
23 goodwill, namely the accounting of profits and losses at fractions of the total expenses that should have
24 been reflected in reporting periods. Id. ¶ 49. Contributing to the showing of scienter as well, the amended
25 complaint now alleges that FA1 expressed concern to CornerStone's Controller about capitalization of
26 acquisition expenses and the likelihood these decisions would be unacceptable to outside auditors. Id. ¶
27 50. The complaint adds a specific incident in which the Controller told FA1 "[d]on't worry about that, we

have the Arthur Andersen thing under control," as well as another occasion on which the Controller stated that Arthur Andersen would do what NorthWestern asked because of the size of their account with Andersen. Id. ¶¶ 50-51. These allegations are accompanied by increased specificity in the complaint about the interdependent financial reporting, head office functions, and executive management of NorthWestern and CornerStone. Id. ¶¶ 3, 5, 52.

Allegations regarding the knowledge and observations of VPC have also been expanded and further detailed, improving the complaint's allegations of both fraud and scienter. The complaint now specifies VPC's record of employment with CornerStone and its acquired subsidiary Empire, as wells as his role in overseeing the property department. Id. ¶¶ 53, 66. The complaint also alleges, based on VPC's personal knowledge, that CornerStone's purchase orders, payroll expenses, and employee disbursements will reveal fabrication and inconsistencies. Id. ¶ 54. In addition, the complaint enumerates in much greater detail defendant Goedde's alleged role in the fraudulent use of acquisition activity as a means to capitalize current expenses, the overvaluation of assets and consequent booking of the value of propane tanks. Id. ¶¶ 56-57. To augment allegations of scienter, VPC recounts personal observations of Arthur Andersen raising significant concerns about CornerStone's goodwill every quarter and the means by which these concerns were filtered through defendants Nye and Goedde such that Andersen "went along with" suspect numbers or practices because of the significance of NorthWestern's account. Id. ¶¶ 56-58, 63. The amended complaint recounts one instance in which two diligent and competent Andersen accountants were transferred off the CornerStone audit team after they expressed concern about asset valuation and other problems, after which they were replaced by a novice who did not object to CornerStone's practices. Id. ¶ 63. Equally as important to a showing of scienter for Nye and Goedde, VPC allegedly voiced reporting discrepancies to both officers and other CornerStone staff, after which he was informally reprimanded. Id. ¶ 65.

Importantly, the complaint now further substantiates allegations regarding knowing overpayment for acquisitions through VPC's allegations of personally observing that purchase prices on acquisitions were agreed to before due diligence was performed to appraise an acquisition's value. The amended complaint now describes a particular instance in which an acquisition was purchased for $7 million which VPC's

6

1 personal appraisal revealed to be worth $3.5 million "at best." Id. ¶ 59.  The complaint also adds the
2 allegation based on VPC's statements and a public offering for partnership units relating to a specific
3 acquisition that CornerStone had the "common practice" of paying for acquisitions with common units
4 rather than cash in order to leverage common units, and with the effect of inflating the purchase price. Id. ¶
5 60-61.

6       Allegations relating to VPC are now reinforced by those of the head of the property department,
7 HPD, who reported to him. Id. ¶¶ 67-68.  HPD's allegations regarding lack of control over the counting
8 and valuation of propane tank assets and intentional accounting manipulations remain central to the
9 complaint, and they are now grounded by clarification of her job position. Id. ¶ 68.  The second amended
10 complaint also adds the allegation from VPC that "everybody" received internal audit reports which HPD
11 received and described. See id. ¶ 68, 77.  Revisions to the complaint also now articulate the relationship
12 between CornerStone's 2001 restatement and HPD's testimony regarding the tank inventories of acquired
13 companies. Id. ¶ 103.

14       In addition to the improvements with existing sources, the second amended complaint adds two
15 new confidential sources, a regional manager ("RM") from CornerStone's IPO through 2003 and a
16 Director of Finance and Accounting ("DFA"), who worked for CornerStone between 1998 and 1999
17 under the supervision of defendant Nye. Id. ¶¶ 84, 87.  RM's knowledge relates to weaknesses in
18 CornerStone's internal controls of its storage tanks, and it coincides with some allegations made by HPD
19 regarding propane tank rental controls. Id. ¶¶ 84-86.  Allegations adding DFA to the mix of sources are
20 vague, but his statements concern the accuracy of inventories at CornerStone service centers. Id. ¶¶ 87-
21 88.[2] The addition of new information about and from former employees at CornerStone or its related
22 entities strengthened the complaint in general and now provides "enough particularized detail to support a
23 reasonable conviction in the informant's basis of knowledge." In re Northpoint Communication Group, Inc.
24 Sec. Litig., 221 F. Supp. 2d 1090, 1097 (N.D. Cal. 2002) (Alsup, J.).  The allegations in the complaint
25 now establish what each confidential source specifically knows and how they came to that knowledge
26 through their position or personal observations.

27       The court therefore finds that the second amended complaint adequately pleads both fraud and
28

7

scienter against all defendants signing SEC filings during the class period. The complaint alleges particularized reasons to believe that acquisition prices were substantially inflated and that financial reporting was manipulated to distort the partnership's fiscal condition. Specific remarks made by individual defendants, internal circulation of negative audit reports, reorganization of outside auditors to deflect scrutiny, and an extremely lucrative, acquisition-based incentive program all converge to raise the inference of scienter.

As this court conveyed in the case management conference, the PSLRA is not an invitation to dizzy the district courts with a revolving door of complaints and motions to dismiss. For this case, at least, the complaint is far from the type of fishing expedition the PSLRA prohibits. See Silicon Graphics, 183 F.3d at 988. As written, there is a "there there"—allegations of a system of fraud corroborated by identified, substantive sources of knowledge, such as former employees and officers acting as confidential sources, accounting and compensation data, auditors' opinions regarding accounting processes and irregularities, and other concrete sources of information. The second amended complaint is eighty-five pages long, including its incorporated chronology of statements and knowledge, and it now contains little boilerplate repetition. To ask more of plaintiffs would make the PSLRA "fatal in fact" at the pleading stage and pit the statute against the dictates of Federal Rule of Civil Procedure 8. See Cornerstone, 355 F. Supp. at 1081 ("Rule 9(b) and PSLRA pleading standards must not be placed on a collision course with Rule 8").

While this court thus reasserts its opinion rendered verbally that the complaint is adequate as amended, the court does not agree with plaintiffs that defendants had no right to bring the present motion to dismiss. Defendants exercised restraint and reasonableness in the breadth of second round motions to dismiss. Defendants Woods and Kittrell are rarely singled out for their individual role in plaintiffs' allegations, and they have the right to question whether the complaint has sufficiently provided notice of the claims against them.

II.     Allegations of Fraud Against Defendant Woods

Defendants argue that paltry allegations lodged specifically against Woods render the complaint against him merely a theory of "guilt by association." The more accurate representation of the complaint

8

1 might be called "guilt by proximity" to the eye of the specific fraud alleged at CornerStone.

2     A.    Misleading Statements

3 The complaint does not allege statements or representations made specifically by Woods. Plaintiffs acknowledge this fact, but argue that lack of specific statements attributed to Woods is resolved by the "group-published" information doctrine, or "group pleading doctrine." The doctrine provides that "where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." In re GlenFed Inc. Sec. Litig., 60 F.3d 591, 593 (9th Cir. 1995). The judicially-created doctrine predates the PSLRA, and therefore focuses on the particularity requirements for pleading fraud under Federal Rule of Civil Procedure 9(b). The Ninth Circuit has interpreted the group pleading rule to require that plaintiffs plead "where possible" individual defendants' roles in alleged misrepresentations. Id.

The doctrine's viability after the passage of the PSLRA in 1995 is the subject of debate among courts, and no ruling has yet issued from the Ninth Circuit on the subject. See Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1018 (11th Cir. 2004) (surveying the debate among courts). The Fifth Circuit has squarely held that the doctrine is inapplicable under the PSLRA's heightened pleading standards, making it the first and only circuit to rule on the issue. See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 365 (5th Cir. 2004). The First and Eleventh Circuits have explicitly avoided resolving the question. See Phillips, 374 F.3d at 1018; In re Cabletron Systems, Inc., 311 F.3d 11, 40 (1st Cir. 2002).

In 2000, a court of this district found that the majority view in the Ninth Circuit preserved the presumption after the PSLRA. See In re Secure Computing Corp. Sec. Litig., 120 F. Supp. 2d 810, 821-22 (N.D. Cal. 2000) (Wilken, J.). Yet it is fair to say that the more recent trend among Ninth Circuit district courts is that plaintiffs must state with particularity facts indicating that an individual defendant was directly involved in the preparation of allegedly misleading statements published by an organization. See, e.g., In re ESS Technology, Inc. Sec. Litig., 2004 WL 3030058 at * 12 (N.D. Cal. 2004) (Whyte, J.); In re Lockheed Martin Corp. Sec. Litig., 272 F. Supp. 2d 928, 936 (C.D. Cal. 2002). See also In re Syncor Intern. Corp. Sec. Litig., 327 F. Supp. 2d 1149, 1171-72 (C.D. Cal. 2004) (holding that under Ninth

Circuit interpretation of the PSLRA, "an assumption of scienter because of a defendant's position does not plead facts in great detail, nor create a strong inference of deliberate recklessness" and therefore does not survive the 1995 Act). On the weight of the precedent, therefore, this court determines that the doctrine can only be applied in the most restrictive circumstances, if at all, i.e., where the pleading gives some basis for ascribing knowledge, participation or authorship, and/or control of the published information to an individual defendant. This formulation goes beyond the group published information doctrine's requirement that a plaintiff plead each defendant's individualized role "where possible," and it reflects principles of notice and particularity central to both that standard and the PSLRA. See In re Glen Fed., 60 F.3d at 593.

Without a robust version of the group pleading doctrine, the complaint does not attribute any allegedly false statements or misleading omissions to Woods. The complaint lacks any allegations to indicate the allocation of responsibility within CornerStone for pricing, obtaining, or accounting for acquisitions. As the officer in charge of CornerStone's acquisitions, one could ascribe, by inference and assumption, many of the allegations in the second amended complaint to his command, i.e. the negotiation, pricing, due diligence, and accounting related to acquisitions. However, the PSLRA particularity requirements do not permit such judicial imagination. Though the second amended complaint has pleaded with particularity a catalogue of materially false and misleading statements, in Woods's case it fails to take the next step of indicating his role in making, approving, or otherwise generating false valuations of acquisitions. See Southland Sec. Litig., 365 F.3d at 364.

Even if group pleading doctrine were in place, defendants argue that the failure to attribute a specific misstatement or omission to Woods is an independent barrier to section 10(b) liability. Defendants seek application of the rule that section 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act," a rule developed by the Court in the context of third-party aiding and abetting liability. Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 177 (1994). Plaintiffs argue that Central Bank is confined to its context of third-party actors, rather than insider defendants alleged to be control persons. The question of how far Central Bank extends is in debate among district courts across the country. Some courts have read Central Bank broadly, and therefore section 10(b) narrowly, to mandate that each individual defendant accused of a section 10(b)

violation must be a "speaker" alleged to have made misleading statements or omissions. See In re Cylink Sec. Litig., 178 F. Supp. 2d 1077, 1085 (N.D. Cal. 2001) (Walker, J.) (dismissing claims against an individual defendant where, at best, "plaintiffs only allege that [defendant] assisted other defendants who allegedly committed securities fraud violations" but failed to allege participation or authorship of fraudulent statements); Powers v. Eichen, 977 F. Supp. 1031, 1040 (S.D. Cal. 1997) (dismissing, by reason of Central Bank, those defendants to whom the allegedly false statements in the complaint were not directly attributed). Supporting this perspective, the Ninth Circuit has found that an individual defendant's area of responsibility within an office did not provide a factual basis for alleging on information and belief that he read and approved a document alleged to contain falsities. See also Neubronner v. Milken, 6 F.3d 666, 673 (9th Cir. 1993).

For other courts, an insider defendant who is a non-speaker can be subject to secondary liability under section 10(b) in certain circumstances, i.e. where defendant is alleged to be a control person. See In re Silicon Graphics, Inc., Sec. Litig., 970 F. Supp. 746, 762 (N.D. Cal. 1997) (Smith, J.) ("In accordance with Central Bank, the Court finds that each defendant is liable for perpetrating a fraudulent scheme only to the extent that he is also found liable for insider trading or making false or misleading statements or as a control person"); In re Rent-Way Sec. Litig., 209 F. Supp. 2d 493, 516 (W.D. Pa. 2002) (distinguishing "individual defendants who are not, like [a third-party accounting firm] limited to liability for the [allegedly false statements] by reason of Central Bank"). In addition, the Second Circuit has imposed post-Central Bank primary liability "not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration." See S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1471 (2nd Cir. 1996).

Buttressing this latter position, the Second Circuit has distinguished fraud alleged against "'controlling person[s],' that is, for fraud planned and directed by upper level management" from "fraud by accountants—secondary actors who may no longer be held primarily liable under § 10(b) for mere knowledge and assistance in the fraud" under the Central Bank holding. Wright v. Ernst & Young LLP, 152 F.3d 169, 176 (2nd Cir. 1998). This court finds a very important reason for this distinction: to read Central Bank as engulfing any and all claims against individual defendants not accused of making fraudulent

11

statements would create tension between section 10(b) and section 20(a), which establishes control person liability. Section 20(a) instructs that persons in control of primary violators will be liable, unless they did not directly or indirectly induce the acts constituting the violation. See 15 U.S.C. § 78t(a). Control persons therefore need not make misstatements themselves—rather they are liable for any alleged violations that they "directly or indirectly induce." Id.

Distinguishing insider defendant control persons in the application of Central Bank answers Woods's legal arguments, but it does not independently resolve the matter of his individual liability. Though Woods is alleged to be a control person, he is not alleged to be in control of primary violators, i.e., there is nothing in the complaint to suggest that he in fact "controls any person" who made false statements. See 15 U.S.C. § 78t(a). In his case, then, Central Bank as applied by most courts would require allegations that Woods is a primary violator of securities laws. As discussed, this court holds that the PSLRA requires a plaintiff to plead an individual defendant's knowledge, authorship, and/or control of allegedly false statements, rather than simply relying on their position to assert fraud liability. See Neubronner, 6 F.3d at 673.

Governed by this standard, the allegations against Woods in the current complaint are insufficient. Though acquisitions, his realm of responsibility at CornerStone, are indeed central to the fraud scheme alleged, there is nothing in the complaint to articulate Woods's role in pricing, negotiating, recommending, or accounting for acquisitions. Specific references to Woods are extremely limited, only alleging his substantial bonuses related to acquisitions and other executive compensation. See Sec. Am. Compl. ¶¶ 17, 31, 32, 36. Such allegations would no more satisfy the required showing of fraud than they would of scienter. As this court made clear in its last order, motive and opportunity standing alone are insufficient grounds for establishing scienter. See CornerStone, 355 F. Supp. at 1091. See also Silicon Graphics, 183 F.3d at 974 (holding that facts which indicate "a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, [but] they are not sufficient to establish a strong inference of deliberate recklessness"). In regards to Woods, motive and opportunity indeed stand alone in the second amended complaint.

Therefore, the court finds that the complaint does not satisfy the fraud or scienter components of the

12

1  PSLRA against defendant Woods. The claim against Woods is dismissed without prejudice. If as a result
2  of discovery, plaintiffs learn of facts that would support claims against Woods sufficient to meet the pleading
3  requirements for fraud and scienter, they may attempt to amend the complaint at that time. [3]

### III.    Allegations of Fraud Against Defendant Kittrell

In contrast to Woods, Kittrell is the star of many specific allegations in the second amended complaint. See Sec. Am. Compl. ¶¶ 18, 28, 31, 32, 36, 55, 77, 83, 168, 183. In addition to allegations regarding his level of incentive compensation related to acquisitions and CornerStone's purported financial health, the complaint names Kittrell as an actor personally involved in three core theories of fraud: (1) the transfer of fraudulent accounting practices from the Managing General Partner to CornerStone, (2) orchestration of CornerStone's books to bury expenses and overstate goodwill, (3) suppression and failure to act upon internal audit reports revealing large numbers of assets that did not actually exist or had been overvalued, and (4) related-party transactions in which defendant Kittrell and other individual defendants leased and subsequently sold storage tanks to CornerStone that were grossly overvalued, if indeed they ever existed at all. See id. ¶¶ 28, 55, 77, 83, 183.

The second amended complaint specifically alleges each of the theories of fraud named above as a basis for impugning the truthfulness of CornerStone's public statements and SEC filings. Based on the testimony of confidential sources whose reliability has been adequately substantiated in the amended complaint, as well as Deloitte & Touche audit reports and public SEC filings, each theory is well developed, with detailed allegations of mechanisms and incidents of fraud. As required by the PSLRA and this court's prior order, the theories are spelled out in chronological detail through a sequence of statements alleged to be false, the basis of their falsity, and the source of knowledge of their falsity.

Kitrell is specifically linked to the complaint's fraud allegations by confidential sources. VPC's testimony alleges that Kitrell, along with Baxter, Goedde and the director defendants, was personally responsible for misstating the partnership's financials relating to acquisitions. Second Am. Compl. ¶ 55. VPC's allegations of misconduct in reporting partnership assets, expenses, goodwill, and acquisitions are thus specifically incorporated against Kitrell. Unlike Woods, Kitrell is therefore implicated as an author of

CornerStone financials as well as a primary perpetrator of a fraudulent scheme, thereby satisfying the requirements of Central Bank.[4]  In addition, Kitrell is alleged to be an owner of an entity leasing propane tanks to CornerStone at a substantial premium. Id. ¶¶ 83, 183.  If proven as a matter of liability, this related-party transaction would also make Kitrell a primary violator under section 10(b).  By specifically alleging Kittrell's primary liability for fraud under section 10(b), defendant is not entitled to dismissal for failure to plead fraud.

As for a showing of scienter as to Kittrell, the complaint alleges substantial motive and opportunity, as was the case with Woods. See Sec. Am. Compl. ¶¶ 18, 31, 32, 36.  Yet the case against Kittrell contains additional, more compelling allegations of scienter, namely a confidential source's observations of reports that were given to Kittrell on a regular basis, Kittrell's own asset ownership and exploitation in related-party transactions observed by a confidential witness,[5] and a source's personal observations that Kittrell was involved in organizing and implementing methods of reorganizing the partnership's accounts to misrepresent its financial health.  HPD reported that Kitrell received internal audit reports revealing the gross overstatement of the Partnership's assets, thus buttressing VPC's allegation that Kitrell was in possession of knowledge that would undermine his financial statements. Id. at ¶ 77.  Due to the substance that confidential sources lend to the allegations of Kittrell's misconduct, the amended complaint "state[s] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  Indeed, in this court's view, Kittrell is among those defendants most centrally-located in the complaint's allegations.

IV.     Control Person Liability

Section 20(a) of the 1934 Securities Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (1988).  "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and

14

the defendant's power to control corporate actions." Kaplan v. Rose, 49 F.3d 1363, 1382 (9th Cir.1994) (internal quotation marks and citations omitted).

Adequate pleading of a primary violation of section 10(b) is required for a plaintiff to plead control liability under section 20(a). See 15 U.S.C. § 78t. As plaintiffs have failed to adequately plead a primary violation of section 10(b) with respect to Woods, the issue of control liability under section 20(a) in his case is moot. As for Kittrell, plaintiffs have adequately alleged that he participated in the day-to-day affairs of the partnership and controlled corporate actions. This is not only due to the basic fact that he was defendant partnership's Chief Operating Officer, but due to the nature of his involvement in receiving internal reports regarding acquisitions, developing accounting practices, and monitoring the company's financial health. VPC's testimony that Kittrell was among a select group of individual defendants responsible for misstating the partnership's financials relating to acquisitions further supports the allegation that Kittrell was in control of statements and information central to the second amended complaint. The court therefore finds that the complaint adequately pleads control person liability under section 20(a) against Kittrell.

## CONCLUSION

For the foregoing reasons, defendant Woods' motion to dismiss is GRANTED with prejudice. Defendant Kittrell's motion to dismiss is DENIED.

IT IS SO ORDERED.

Dated: July 5, 2005

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

ENDNOTES

1. All facts in this section are drawn from the Second Amended Class Action Complaint, unless otherwise noted.

2. The second amended complaint also references "other former employees," including a crude oil buyer and a director at CornerStone's acquired subsidiary Coastal, who observed variations in CEO Baxter's financial reports on CornerStone depending on his audience. Second Am. Compl. ¶ 89. However the court finds this reference to be too vague to provide support for misstatements, let alone scienter.

3. The court makes this possible allowance because it defies logic and common sense that the Vice President of Acquisitions did not have knowledge of, let alone participate in, the acquisition activities of Cornerstone, unless he intends to play the "dumb executive" card.

4. Kitrell is not named ad nauseam throughout the complaint for his personal responsibility for each statement made, but this court disagrees with that technocratic characterization of pleading requirements built on principles of notice.

5. Defendant cites this court's former order for the proposition the allegations about the LQA1 entity were unsubstantiated, and that insufficient amendment has been done to correct the deficiency. See CornerStone, 355 F. Supp. at 1086. The court disagrees. The order stated that "without pleading PDE's basis of knowledge, the complaint has not yet substantiated the allegation regarding the LQA1 entity." Id. By clarifying PDE's source of knowledge, the complaint resolved this concern.